[No. 44043. En Banc. September 30, 1976.]

KING COUNTY WATER DISTRICT NO. 54, ET AL, *Appellants*, v.
KING COUNTY BOUNDARY REVIEW BOARD,
ET AL, *Respondents.*

*Robert J. Hall,* for appellant King County Water District No. 54.

*John H. Rayback, pro se,* and for appellant Bernard.

*Slade Gorton, Attorney General, Walter E. Webster, Special Assistant,* and *Robert J. Verzani,* for respondents.

UTTER, J.—Acting pursuant to RCW 35.13A, the City of Des Moines took steps to assume the jurisdiction, facilities, and assets of King County Water District No. 54. The proposed assumption was submitted to the King County Boundary Review Board, as required by RCW 36.93, and the board approved the proposal. The board's decision was in turn appealed to the Superior Court by the water district and residents of the district. District No. 54 sought reversal on the grounds that the Boundary Review Board violated the appearance of fairness doctrine and failed to comply with certain provisions of RCW 36.93. Additional appellants claimed that, as applied to the circumstances of this case, RCW 35.13A was constitutionally deficient. The Superior Court upheld the action of the board and we affirm its judgment.

Property located within the boundaries of respondent City of Des Moines, with one minor exception, is served by water districts Nos. 54 and 75, the latter serving the largest area. Of the 400 acres encompassed by district No. 54, approximately 345 acres are within the City of Des Moines. In September 1972, the City Council adopted ordinance No. 313 declaring its intention to acquire and operate a water system, a function authorized by RCW 35.92. This proposition was submitted to the voters at a city election and approved. Acting under RCW 35.13A, the City Council, in ordinance No. 320, determined to assume the jurisdiction, facilities, and assets of appellant Water District No. 54, "subject to all financial, statutory, or contractual obligations of the district for the security or performance of which such property may have been pledged." The ordinance, paralleling the language of RCW 35.13A.020, made the City's power of management and collection of charges subject "to any outstanding indebtedness . . . of the district payable from taxes, assessments or revenues of any kind or nature and to any other contractual obligations of the district." As of December 31, 1971, the long-term indebtedness of the district consisted of general obligation bonds in the amount of $131,000 and revenue bonds in the amount of $119,000.

The City's proposed assumption of district No. 54 was then submitted to respondent King County Boundary Review Board. *See* RCW 36.93.090-.100. A public hearing was held on February 22, 1973, at which appellants and other persons commented on the proposal. The matter came before the board at its meeting of March 8 and was subsequently approved by the board in its resolution and hearing decision adopted by a vote of 7 to 2 on March 29, 1973.

I

This case presents an example of the authority of the state legislature to alter the forms of local government by reducing the number of fragmented and overlapping jurisdictions, to make local government more efficient and more responsive. In recent decades the special district form of

government has been widely used to solve some of the problems generated by rapid growth in metropolitan areas. *See* J. Bollens, *Special District Governments in the United States* 48-52 (1961). These limited function entities were created to provide needed services which local general government was unable to provide, and, in some instances, to circumvent state limitations on local government indebtedness. *See, e.g.,* Makielski, *The Special District Problem in Virginia,* 55 Va. L. Rev. 1182, 1185-89 (1969); Rafalko, *Overlapping Districts Versus Municipal Authorities in the Area of Urban Redevelopment,* 3 San Diego L. Rev. 24 (1966). The proliferation of special districts, however, generated problems of overlapping boundaries, increased tax burdens and "short-sighted and inefficient government" because their functions are often not coordinated with overlapping or adjoining government entities. R. LeGates, *California Local Agency Formation Commissions* 7 (1970); *see generally* Advisory Commission on Intergovernmental Relations, 1 *Substate Regionalism and the Federal System, Regional Decision Making: New Strategies for Substate Districts* 19-47, 353-63 (1973).

In this state, the legislature has found rapid increase in the number of local governmental units "affect[s] adversely the quality and quantity and cost of municipal services furnished, the financial integrity of certain municipalities, the consistency of local regulations, and many other incidents of local government." RCW 36.93.010. The legislature also recognized that competition among local jurisdictions for unincorporated territory has a "disorganizing effect . . . on land use" patterns. RCW 36.93.010. *See also* Cal. Gov't Code § 54774 (West Supp. 1976). To remedy these and other problems, the legislature established a Boundary Review Board in most counties. RCW 36.93.030. It also provided mechanisms for the consolidation of government units, *see* RCW 35.10; the merger of limited function districts, *see* RCW 57.36, 57.40; and the assumption by a city of special purpose districts lying partially within the city, *see* RCW 35.13A.

■ The principles governing the legislature's authority to institute such reforms, including that sought to be accomplished in the present case, are well established. Respondent City of Des Moines, a third-class city at the time of events giving rise to this litigation occurred (see RCW 35.01.030; RCW 35.24), and appellant Water District No. 54, a special purpose district formed and operated under RCW Title 57, are both municipal corporations. Each is "a body politic established by law as an agency of the state . . . to regulate and administer the local and internal affairs of the incorporated city, town, or district." *Lauterbach v. Centralia*, 49 Wn.2d 550, 554, 304 P.2d 656 (1956). *See also* 1 E. McQuillin, *Municipal Corporations* §§ 2.13, 2.23 (3d rev. ed. 1971). As political subdivisions of the state, municipal corporations are subordinate to the legislature which, limited only by the constitution, has absolute control over the entities it has created, including the geographical extent of their jurisdiction and the powers they may exercise. *State Bd. Against Discrimination v. Board of Directors*, 68 Wn.2d 262, 269, 412 P.2d 769 (1966); *Kitsap County v. Bremerton*, 46 Wn.2d 362, 368, 281 P.2d 841 (1955); *State ex rel. Bd. of Comm'rs v. Clausen*, 95 Wash. 214, 222-23, 163 P. 744 (1917); *see Massie v. Brown*, 84 Wn.2d 490, 492, 527 P.2d 476 (1974).

The state legislature possesses this power because, unlike the federal constitution which is a grant of power to Congress, the state constitution is a limitation on legislative powers. *Robb v. Tacoma*, 175 Wash. 580, 586-87, 28 P.2d 327, 91 A.L.R. 1010 (1933). The power of the legislature over political subdivisions of the state is plenary unless restrained by the constitution. *State ex rel. Barlow v. Kinnear*, 70 Wn.2d 482, 486, 423 P.2d 937 (1967); *State Bd. Against Discrimination v. Board of Directors, supra* at 269; *see* 2 E. McQuillin, *Municipal Corporations* § 4.03 *et seq.* (3d rev. ed. 1966).

II

■ The first group of questions presented by this appeal concerns the proceedings and decision of the King

County Boundary Review Board. Appellant asserts alleged conversations between a member of the board and persons associated with other water systems violates the appearance of fairness doctrine. Under that principle, members of commissions having the role of conducting fair and impartial fact-finding hearings must, as far as practicable, be objective, be free of entangling influences, and execute their duties with the appearance, as well as the reality, of fairness. *Buell v. Bremerton*, 80 Wn.2d 518, 523, 495 P.2d 1358 (1972). *See Swift v. Island County*, 87 Wn.2d 348, 552 P.2d 175 (1976). The doctrine applies to invalidate decisions taken where an interest is shown which might have substantially influenced a member even though that interest did not actually affect his decision. *Narrowsview Preservation Ass'n v. Tacoma*, 84 Wn.2d 416, 420, 526 P.2d 897 (1974).

Assuming the doctrine applies in these circumstances, appellant's contention must be rejected for two reasons. First, the record contains no indication of the contents of the ex parte discussions and does not even show that such conversations took place.[1] Second, even assuming appellant's factual allegations to be true, no violation of the appearance of fairness doctrine is established. At the March 8, 1973, meeting of the Boundary Review Board, Mr. Royal, a board member, is said to have mentioned his discussions about the proposed assumption with an employee of the Seattle Water Department and a commissioner of Water District No. 75. Appellant does not know the contents of these conversations nor does it suggest any partiality or entangling influences on the part of Mr. Royal. There is no suggestion of any interest of the member which could be affected by assumption of the district's operation by the City. Thus, these circumstances reflect no more than a

---

[1] Appellants chose to appeal the board's decision pursuant to RCW 36.93.160 in lieu of seeking review by writ of certiorari, RCW 7.16.040. Under RCW 36.93.160(5), the Superior Court "shall not take any evidence other than that contained in the record of the hearing before the board." Appellants were thus precluded from introducing affidavits, depositions, or oral testimony regarding the alleged conversations.

"mere acquaintance with, or casual business dealings in a minimal sense" with the Seattle Water Department employee and the district No. 75 commissioner. *See Narrowsview Preservation Ass'n v. Tacoma, supra* at 421. Even under appellant's version of the facts, there is nothing from which we could conclude that Mr. Royal could not "both in fact and appearance be open-minded, objective, impartial and free of entangling influences" in his consideration of the proposed assumption. *See Narrowsview Preservation Ass'n v. Tacoma, supra* at 421; *cf. Byers v. Board of Clallam County Comm'rs,* 84 Wn.2d 796, 802-03, 529 P.2d 823 (1974).

Appellant also maintains the same conversations of Mr. Royal constitute evidence taken by the board but omitted from the record of its proceedings in violation of RCW 36.93.160. However, that section requires only that "[a] verbatim record shall be made of all testimony presented at the [public] hearing". RCW 36.93.160(2). The sole hearing held by the board in the present case was that on February 22, 1973, a complete transcript of which is before this court in compliance with the statute.

Appellant argues that the Boundary Review Board failed to comply with its statutory mandate inasmuch as it did not consider the factors specified in RCW 36.93.170 and its decision does not achieve the objectives listed in RCW 36.93.180. In its resolution and hearing decision, the board found that the proposed assumption "tends to accomplish" objectives (1) and (3) of RCW 36.93.180, the preservation of natural communities and the creation of logical service areas. The board determined that assumption by the City "will enhance the level of community services as well as communication and identity of these citizens by and with the City, and, therefore, tend to preserve this community." The board also found, after reviewing pertinent facts, that the district lies within the logical service area of the City. Courts will not substitute their own judgment for that of an administrative agency acting within the sphere of its expertise. *Hayes v. Yount,* 87 Wn.2d 280, 552 P.2d 1038

(1976); *Farm Supply Distribs., Inc. v. State Util. & Transp. Comm'n*, 83 Wn.2d 446, 448, 518 P.2d 1237 (1974). The administrative determinations of the board are supported by material and substantial evidence in view of the entire record as submitted and are neither arbitrary nor capricious. *Cf.* RCW 36.93.160 (6).

The Boundary Review Board's decision states "the Board has considered the many factors prescribed in RCW 36.93.170" and discusses no fewer than 14 of these factors "selected for particular attention." The board concluded:

> the proposal will have a beneficial effect upon the local government structure of the County. The assumption will reduce by one the number of governmental entities which must be dealt with by residents of the area . . . Perhaps most important, the City will gain control over a basic governmental function within at least a portion of the City corporate area.

This determination, supported by the evidence, demonstrates attention to the factors stated in RCW 36.93.170 (3). Any additional factors which citizens, government officials, and others desired to bring to the board's attention were presented at the public hearing. The Boundary Review Board fully complied with the pertinent statutes.

Appellant also asserts that the proposed assumption conflicts with the statutorily prescribed procedures for the dissolution of water districts, *see* RCW 57.04. No such conflict exists, however, because the legislature has provided an alternative means of dissolution in RCW 35.13A. That chapter establishes procedures for dissolution following assumption "notwithstanding any other method of dissolution provided by law". RCW 35.13A.080.

Two additional contentions of appellant have no factual basis in the record before us.

### III

Additional appellants Bernard and Rayback maintain the Superior Court erred in two respects. They argue first that the court failed to enter formal findings of fact and conclusions of law as required by CR 52. No such findings and conclusions are required where, as here, the

trial court reviews only the administrative record and does not itself take evidence. *See* RCW 36.93.160(5). "Each level of the judiciary actually reviews administrative decisions in an appellate capacity." *Farm Supply Distribs., Inc. v. State Util. & Transp. Comm'n, supra* at 448. The findings and conclusions necessary for appellate review are entered by the agency, and, in the present case, are contained in the Boundary Review Board's resolution and hearing decision.

They further urge the trial court erred in failing to hold the exercise of municipal power authorized by RCW 35.13A unconstitutional as applied to the circumstances of this case. *Cf.* RCW 36.93.160(6)(a). Specifically, additional appellants contend that, following the assumption, persons residing within Water District No. 54 but not within the City of Des Moines, represented by William and Carol Bernard, are unconstitutionally subject to the authority of the City inasmuch as they cannot vote in city elections. In support of their position, additional appellants rely solely on *Malim v. Benthien*, 114 Wash. 533, 196 P. 7 (1921). In that early case portions of the diking and drainage act of 1895 were held unconstitutional on the ground that persons residing outside the drainage district but benefited by its operation were subject to assessments levied by the district but had "no voice whatever in the selection of its officers or determining its policy". *Malim v. Benthien, supra* at 539.

Despite the fact that extraterritorial powers are often exercised by local governments, *see, e.g.,* F. Sengstock, *Extraterritorial Powers in the Metropolitan Area* (1962); Anderson, *The Extraterritorial Powers of Cities*, 10 Minn. L. Rev. 475, 564 (1926), relatively few cases have addressed the constitutional questions raised by such arrangements. Statutes authorizing the exercise of municipal authority over utility service beyond municipal boundaries have been upheld in the face of constitutional challenge, but the precise question presented here, the disfranchisement of nonresidents, was not expressly addressed. *See, e.g., Smart v. Gates*, 234 Ark. 858, 355 S.W.2d 184 (1962); *Charlotte v. Heath*, 226 N.C. 750, 40 S.E.2d 600, 169 A.L.R. 569 (1946);

*Ben Avon Borough v. Crawford,* 64 Pa. Super. 163 (1916); *Mayo v. Dover & Foxcroft Village Fire Co.,* 96 Me. 539, 53 A. 62 (1902); *contra, Malone v. Williams,* 118 Tenn. 390, 103 S.W. 798 (1907); *see generally* Annot., *Power of municipal corporation to extend its service beyond corporate limits,* 98 A.L.R. 1001, 1005-06 (1935). In *Schlientz v. North Platte,* 172 Neb. 477, 490, 110 N.W.2d 58 (1961), the court upheld extraterritorial zoning by a city, stating that persons not residents of the city "have neither a constitutional nor inherent right to local self-government. The Legislature may subject them to the jurisdiction of officers for whom they have no voice in the selection." The opinion, however, did not elaborate on the analysis supporting this conclusion.

■ It is true that the legislature does subject persons to the authority of officials selected without any direct voice of the persons affected. In our governmental system such arrangements, in the form of administrative agencies, are both necessary and commonplace. These entities possess a large measure of authority, including the power to legislate, and affect vital interests of citizens, yet constitutionally may do so as long as there are safeguards to protect against injustice on account of unnecessary and uncontrolled discretionary power. *See* K. Davis, *Administrative Law Text* § 2.01 *et seq.* (3d ed. 1972). This court has held constitutional the legislature's creation of government entities staffed by unelected officials so long as guidelines for administrative conduct are established and adequate procedural safeguards are provided. *Yakima County Clean Air Authority v. Glascam Builders, Inc.,* 85 Wn.2d 255, 534 P.2d 33 (1975); *Rody v. Hollis,* 81 Wn.2d 88, 500 P.2d 97 (1972). This evolution in our governmental structure and legal principles suggests that some of the analysis employed in *Malim v. Benthien, supra,* is no longer viable.

■ By analogy, in RCW 35.13A the legislature has created an administrative agency with respect to residents of the water district who do not reside within the city. This "agency" is the city government of Des Moines to the ex-

tent that it manages and operates the water system formerly organized as Water District No. 54. The City Council's authority in this regard is clearly legislative in nature, *see* RCW 35.13A.020 and RCW 35.92, but is accompanied by sufficient standards and safeguards to satisfy constitutional requirements. The legislature has imposed a standard of uniformity of water rates for the same class of customers or service. RCW 35.92.010. Connection charges must be set so that property owners bear their "equitable share" of the cost of the system. RCW 35.92.025. The method of financing the water system is comprehensively regulated by state law. RCW 35.92.070 *et seq.* Moreover, nonresidents of the city are protected from truly discriminatory, arbitrary, and unreasonable rates by the courts. *See Faxe v. Grandview*, 48 Wn.2d 342, 294 P.2d 402 (1956); *Geneva Water Corp. v. Bellingham*, 12 Wn. App. 856, 532 P.2d 1156 (1975). Nonresidents may also attend and participate in public meetings of the city council. RCW 35.24.180. While more could be done, particularly by the city, to structure its discretionary power through public-participation mechanisms, principles, rules, and other safeguards, *see* K. Davis, *supra* at § 2.08, in light of the limited impact of the single city function involved here, the above controls are adequate.

The commands of the equal protection and privileges and immunities clauses are, of course, applicable here.[2] The latter provision was the basis for the holding in *Malim v. Benthien, supra.* These federal and state constitutional clauses generally have been given the same meaning. *Northshore School Dist. 417 v. Kinnear*, 84 Wn.2d 685, 721, 530 P.2d 178 (1974); *State v. Perrigoue*, 81 Wn.2d 640, 641, 503 P.2d 1063 (1972). The distinction drawn in this case

---

[2]*Hunter v. Pittsburgh*, 207 U.S. 161, 52 L. Ed. 151, 28 S. Ct. 40 (1907), is sometimes cited for the rule that no federal constitutional right may ever be impaired by alteration of the boundaries of a municipal corporation. That proposition has been rejected in at least one subsequent case, *Gomillion v. Lightfoot*, 364 U.S. 339, 342-48, 5 L. Ed. 2d 110, 81 S. Ct. 125 (1960), and the continued viability of the expansive language in *Hunter* is questionable. *See* Note, *The Right to Vote in Municipal Annexations*, 88 Harv. L. Rev. 1571, 1579-81 (1975).

between city residents and nonresidents with respect to general city elections is permissible in light of the fact that city residents are substantially affected by all city actions, not just its management of the water system, and as necessary to preserve the basic conception of a political community. *See Dunn v. Blumstein*, 405 U.S. 330, 343-44, 31 L. Ed. 2d 274, 92 S. Ct. 995 (1972); *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 35 L. Ed. 2d 659, 93 S. Ct. 1224 (1973); *cf. State ex rel. Conner v. Superior Court*, 81 Wash. 480, 488-89, 143 P. 112 (1914). In *Kollar v. Tucson*, 319 F. Supp. 482 (D. Ariz. 1970), *aff'd mem.*, 402 U.S. 967 (1971), the court upheld a state statute limiting the franchise in municipal water bond elections to qualified electors of the municipality. After reviewing the voting rights decisions of the Supreme Court, the court concluded:

> The necessity of a boundary restriction in municipal elections, rather than some other less definitive qualification, the generally greater stake of residents in local elections, and the necessity to define the electorate in advance of election date and properly to administer the elections are sufficiently compelling interests, in this instance, for Arizona's limitation on an absolute right to vote. *To allow the municipal franchise to all persons with a pecuniary interest would not permit of a manageable standard or adequately define a cohesive interested group of electors.*

(Italics ours.) *Kollar v. Tucson, supra* at 485.

 Additional appellants further contend that the assumption of the assets, property, and facilities of Water District No. 54 by the city is a taking of their property without just compensation in violation of article 1, section 16 (amendment 9) of the state constitution. That provision, however, protects only private, not public, property. The residents of the district do not own its holdings. We have upheld the authority of the legislature to transfer the assets of one government unit to another as consistent with the state constitution. *Moses Lake School Dist. 161 v. Big Bend Community College*, 81 Wn.2d 551, 557-58, 503 P.2d 86

(1972); *Wheeler School Dist. 152 v. Hawley,* 18 Wn.2d 37, 46, 137 P.2d 1010 (1943).

However, under one set of circumstances, persons residing in the former district but not in the city have a property interest which may be unconstitutionally deprived under the arrangement contemplated by RCW 35.13A. Following the assumption proposed here, the "legislative body of the city shall act as the officers of the district for the purpose of certifying the amount of any property tax to be levied and collected therein . . .", that is, within the boundaries of the former district. RCW 35.13A.020. While respondent City's ordinance No. 313 states that no general indebtedness will be incurred in the acquisition, maintenance, and operation of the water system, that ordinance is subject to repeal and amendment by city voters. Residents of the district but not the city, unable to vote in city elections, would be powerless to prevent such an amendment. Pursuant to RCW 35.92.070 and .080, city voters, including those not served by the water system, could then authorize a general indebtedness. These general obligation bonds could be repaid by taxation of property located within the former district. These taxes, like "[a]ll taxes and levies which may . . . be lawfully imposed", are declared to be a lien on the real property upon which they are imposed. RCW 84.60.010. Thus, persons represented by additional appellants Bernard conceivably are subject to loss of their property without any direct and practical method of influencing the decisions which lead to such a consequence.

There is an increasing recognition that persons residing beyond municipal boundaries, but directly affected by municipal actions, have a due process right to participate in the municipal decision making process even though they are not city residents. *See Scott v. Indian Wells,* 6 Cal. 3d 541, 492 P.2d 1137, 99 Cal. Rptr. 745 (1972). In *Olympic Forest Prods., Inc. v. Chaussee Corp.,* 82 Wn.2d 418, 423, 511 P.2d 1002 (1973), we recognized that

> "due process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time,

place and circumstances. . . . [It] is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process. *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 162, 95 L. Ed. 817, 71 S. Ct. 624 (1951). (Frankfurter, J., concurring.)

Thus, this court long ago observed "[i]t is not easy to define in general terms 'due process of law' with such precision that we may at once see the exact limit of legislative power fixed by these words . . ." *State v. Strasburg*, 60 Wash. 106, 117, 110 P. 1020 (1910). Nevertheless, in giving content to the broad language we are guided by the purpose of the constitutional requirement, which is "to protect the individual against arbitrary action on the part of the state . . . to secure the citizen against any arbitrary deprivation of his rights relating to his life, liberty or property." *State v. Seattle Taxicab & Transfer Co.*, 90 Wash. 416, 430, 156 P. 837 (1916). The specific procedures required by due process depend upon many factors including the precise nature of the citizen's interest, the manner in which it is affected, the reasons for doing so, and the available alternatives to the procedure that was followed. *Olympic Forest Prods., Inc. v. Chaussee Corp.*, *supra* at 423-24. At bottom, the application of the due process clause is an intensely practical matter. *Goss v. Lopez*, 419 U.S. 565, 578, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975).

The threat of the encumbrance of property by a lien arising from the issuance of general obligation bonds by the City is serious. Were these circumstances to occur, due process could require those persons represented by additional appellants Bernard be given an effective, direct means of protecting their property—a vote in city elections which choose the governing body of the water system following assumption by the City. These facts are not now before the court, however, and we will not invalidate RCW

550

35.13A on the basis of such conjecture. *Hayes v. Yount*, 87 Wn.2d 280, 552 P.2d 1038 (1976).

*Port of Tacoma v. Parosa*, 52 Wn.2d 181, 193, 324 P.2d 438 (1958), is not in conflict with this analysis. There we held that no question of due process is presented by the inclusion of the property of nonconsenting property owners within the boundaries of a city or town and the imposition of general taxes on that property. In that situation, of course, those persons residing on the property are fully eligible to vote in the elections of the city or town. Nor is due process denied if water district indebtedness in the form of revenue bonds is incurred. Payments on those obligations are made from gross revenues of the water system and constitute a lien against such revenues. RCW 57.20.020. Revenue bonds are not repaid by the imposition of taxes on property within the district. 15 E. McQuillin, *Municipal Corporations* § 43.11 (3d rev. ed. 1970).

Judgment affirmed.

STAFFORD, C.J., and ROSELLINI, HUNTER, HAMILTON, WRIGHT, BRACHTENBACH, HOROWITZ, and DOLLIVER, JJ., concur.

Petitions for rehearing denied December 6, 1976.